[Civ. No. 309. Fourth Appellate District.—February 25, 1931.]

PACIFIC COAST COAL COMPANY (a Corporation), Appellant, v. LINDSAY COOPERATIVE CITRUS ASSOCIATION (a Corporation), Respondent.

D. E. Perkins for Appellant.

Jas. R. McBride and H. B. McClure for Respondent.

BARNARD, P. J.—In this action, the plaintiff seeks to hold the defendant as an acceptor of a bill of exchange. The defendant is engaged in conducting a packing-house for oranges and other citrus fruits at Lindsay, California. The plaintiff is engaged in the business of manufacturing and selling briquets or solid fuel for orchard heaters, and in the fall of 1925 one C. A. Bishop was its agent in the vicinity of Lindsay. At the same time, in the same vicinity, one J. W. Irwin, as the agent of the Phillips Orchard Heater Company, was selling orchard heaters designed to use solid fuel. Because of their common interest, these two salesmen worked together in soliciting business, and occasionally each would take orders for the other, but

without compensation. Late in October, 1925, as the two agents were passing the property of one Ivan McIndoo, Irwin remarked that they could sell some heaters and fuel to him. Bishop replied that "we couldn't accept Mr. McIndoo's business without a packing-house order". Later, Bishop went to Los Angeles, leaving with Irwin an order book on which he could take orders for briquets. Irwin secured an order from McIndoo for heaters, and also one for a hundred tons of briquets which are involved in this action. On November 20, 1925, Irwin wired Bishop as follows:

"Ivan McIndoo offers packing-house acceptance out of Valencia crop next May hundred tons briquets buying seven hundred fifty heaters asking same terms on five hundred dollars of heater order paying three hundred twenty five dollars cash on heaters communicate with Phillips wiring reply quick when would briquets arrive."

The same day Bishop replied by wire:

"Phillips will accept McIndoo order but wants acceptance accompanied by seven per cent personal note stop I will accept acceptance from Mr. McIndoo packing-house to read May fifteenth with six per cent per annum from January first stop If this is satisfactory have packing-house wire authorizing terms and I will wire order immediately and send order for signature."

Irwin and McIndoo visited this defendant and secured and sent to Bishop a telegram reading:

"Lindsay, Calif. 1106 A Nov 21, 1925.

"C. A. Bishop
"700 W. 30th Street, Los Angeles, Calif.
"We agree sign packing-house acceptance in payment of heaters and briquets for Ivan McIndoos requirements payments for above to be made by May fifteenth twenty seven. Lindsay Cooperative Citrus Assn 1202 P."

He replied to Irwin as follows:

"I am in receipt of telegram from Lindsay Cooperative referring to Ivan McIndoo order which reads payment for above to be made May 15 27 stop I am very glad to extend the courtesy to Mr. McIndoo of May 15, 1926, as per my telegram kindly interview Lindsay Cooperative and see if that is satisfactory stop Immediately on receipt of your wire I will telegraph the order to Seattle."

Upon receipt thereof, Irwin prepared another telegram and, with McIndoo, went to defendant's packing-house, procured defendant's signature thereto and forwarded it to Bishop. This read:

"Lindsay Calif 1045 A Nov 23 1925

"C. A. Bishop

"Answer NL 2–700 West 30 St Los Angeles

"Calif

"Correct our telegram of twenty first regarding Ivan McIndoos acceptance to read payment May 15 1926 instead of 1927."

Upon receipt of that telegram, Bishop forwarded an order to plaintiff and the briquets were shipped to McIndoo. Plaintiff wrote to defendant under date of November 24, 1925, as follows:

"Lindsay Co-operative Citrus Association,

"Lindsay, California.

"Gentlemen:

"This will acknowledge receipt of and confirm your order given our Mr. Bishop directing 100 tons of Diamond Briquets, sacked, to be shipped Ivan McIndoo at Lindsay. It is understood that we are to prepay the freight and that payment will be due May 15, 1926, with interest from January 1, 1926.

"We thank you for this order and it is being given our immediate attention.

"Yours very truly,

"PACIFIC COAST COAL COMPANY"

The following trade acceptance was also sent:

"Seattle, Wash. Nov. 30, 1925

"$1669.44

"On May 15, 1926, pay to the order of Pacific Coast Coal Company, 563 R. R. Ave., So., Seattle, Wash. One Thousand Six Hundred Sixty Nine 44–100 dollars. The obligation of the acceptor hereof arises out of the purchase of goods from the drawer. To Lindsay Co-operative Citrus Assn., Lindsay, Calif.

"PACIFIC COAST COAL COMPANY

"By ——————, Asst. Sales Manager."

Under date of December 10, 1925, defendant wrote to plaintiff as follows:

"We have received your letter of Nov. 24th, accompanied by freight bills and invoices covering 100 tons of Diamond briquets shipped to Ivan McIndoo at Lindsay, also trade acceptance which you desire this association to execute in your favor.

"In order that this matter may be handled by us under the same conditions as other such transactions for our other growers have been handled we would suggest that you make out the trade acceptance covering this purchase designating Ivan McIndoo as the acceptor, with this Association as endorser of such acceptance.

"Will you kindly arrange to handle this transaction in this manner."

To this letter the plaintiff replied as follows:

"Replying to your letter of December 10th, we made our trade acceptance in line with your order, as received by telegraph from our Mr. Bishop. To this date we have never received a written confirmation of this order.

"In conformity with your request we are attaching our trade acceptance No. 106 for $1669.44, made out to Ivan McIndoo, and will ask you to kindly have this accepted by him, with your endorsement."

Enclosed with this reply was a second trade acceptance, reading thus:

"Seattle, Wash., Nov. 30, 1925.
"On May 15, 1926, after blank Pay to the order of Pacific Coast Coal Company, 563 R. R. Ave., So. Seattle, Wn. One Thousand Six Hundred sixty nine 44–100 Dollars.
"PACIFIC COAST COAL COMPANY.
"By ————————,
"Ass't Sales Mgr.
"To Ivan McIndoo, Lindsay, Calif."

This was forwarded by defendant to McIndoo, together with a similar one in favor of the Phillips Orchard Heater Company, for his acceptance. McIndoo signed and returned the one in favor of the Phillips Orchard Heater Company, but refused to sign the one in favor of this plaintiff, because of the misunderstanding in regard to the date of maturity. The defendant never accepted or returned to the plaintiff either of said bills of exchange or trade acceptances. From a judgment in favor of the defendant the plaintiff has appealed.

The appellant first contends that this transaction discloses a written promise upon the part of the respondent to accept a bill of exchange for goods sold and delivered to McIndoo, one of respondent's customers, within the meaning of section 3216 of the Civil Code. This section reads as follows:

"Promise to Accept. An unconditional promise in writing to accept a bill before it is drawn is deemed an actual acceptance in favor of every person who, upon the faith thereof receives the bill for value."

Appellant also relies upon the case of *James* v. *E. G. Lyons Co.*, 134 Cal. 189 [66 Pac. 210]. In that case it was held that a certain letter "read and interpreted in the light of what had preceded it, as well as what followed it," contained an unconditional promise to accept a certain instrument. ▆ It can hardly be doubted that where an unconditional promise in writing to accept a bill of exchange is shown, the promisor will be bound thereby. However, the language used must be such as to import an absolute promise to accept, and unless the words used import a clear and unequivocal acceptance, no recovery may be had. *(First Nat. Bank* v. *Commercial Sav. Bank,* 74 Kan. 606 [118 Am. St. Rep. 340, 11 Ann. Cas. 281, 8 L. R. A. (N. S.) 1148, 87 Pac. 746, 747].) In that case, in which it was sought to hold a bank as having accepted, through certain telegrams, a bill of exchange in the form of a check, the court said:

"A request upon a bank that it accept a check is a request for the creation of a legal relation between the holder and the bank, wholly without and beyond the purview of the paper. If such relation be established, it imposes upon the bank a liability to a party to whom it was not before bound at all, and it converts the privilege of the bank to pay if in funds into an absolute and unconditional duty to pay, no matter what may be the state of the depositor's account. Anyone claiming to be the beneficiary of a contract of this kind, independent of and collateral to the check, must clearly show that the bank intended to make it. Neither law nor custom binds parties to the use of any set formula in arranging an acceptance. They may choose their own words. Brevity is not simply allowable, it is commendable; but in all cases there must be no doubt that an absolute promise was made."

In *Meyers* v. *Union Nat. Bank,* 27 Ill. App. 254, it is said: "One relying on a telegram as an acceptance should see to it that the language used will, at least, fairly bear the meaning." ▄▄▄ We think that the transaction before us does not disclose an intention to bind the respondent to pay in any event, and regardless of any signing by McIndoo. No specific or unconditional promise to accept a draft is shown. The respondent did not agree to "accept" but to "sign packing house acceptance". The word "sign" can hardly be said to be synonymous with the word "accept". It cannot be certainly said that the agreement was to sign as acceptor. From the face of the agreement it is just as plausible to say that the contract was to sign as indorser, which entails a very different responsibility, and this is much more plausible when the surrounding circumstances are considered. Upon the face of the instrument, the words "sign packing house acceptance" indicate something different from the ordinary agreement to accept unconditionally. The reference to McIndoo's requirements indicates that McIndoo is to order the goods. It would naturally appear that the acceptance they agree to sign is one tied up with the packing-house business, and the natural inference is that the respondent agrees to sign some sort of an order given by McIndoo; or in other words, that respondent will sign something as surety for him.

In accordance with the rule laid down in *James* v. *E. G. Lyons Co., supra,* the telegram here in question should be interpreted in the light of what preceded and what followed it. In examining the entire transaction, we find throughout the idea of suretyship or liability as an indorser, rather than direct primary liability, on the part of the respondent. In the first conversation with Irwin, in reference to the possibility of an order from McIndoo, Bishop, appellant's agent, stated that they "couldn't accept Mr. McIndoo's business without a packing-house order", thus expressing the idea of obtaining security. In the first telegram of November 20th, from Irwin to Bishop, it is stated that "McIndoo offers packing-house acceptance payable out of Valencia crop next May", which not only carries on the idea of security but indicates a particular fund from which it is to be paid. In replying, Bishop says that Phillips will accept the McIndoo order but wants acceptance, and that he himself will

"accept acceptance from McIndoo packing-house", which seems to refer to the same sort of acceptance McIndoo had offered, and he goes on to request a wire from the packing-house authorizing such terms. This further indicates that the order is to come from McIndoo and that security is wanted. The respondent's manager testified that at the time the next telegram, the one upon which this action is largely based, was sent, McIndoo and Irwin came to the packing-house and told him they wanted to see if the packing-house would indorse Mr. McIndoo's order for some briquets and heaters, and Irwin then prepared the telegram. As has been said, the language then used indicates something different from "accept". The word "sign" is qualified by the words "packing-house acceptance"; both together imply something other than the usual absolute acceptance; and the surrounding circumstances indicate that the transaction was based upon the fact that respondent would handle McIndoo's crop, and would sign a packing-house acceptance rather than an "acceptance". Whether this takes the form of accepting an order from McIndoo, or of indorsing an acceptance made by McIndoo, the reference to a different kind of acceptance and to McIndoo's requirements, seems to carry on the idea of some form of security for McIndoo, and points to secondary, rather than primary, liability. In his reply telegram, Bishop says he is glad to extend the courtesy of a different credit to McIndoo, but wants to be sure the change in date is satisfactory to this respondent. This indicates not only the giving of credit to McIndoo, but proper care to have the consent of a surety. McIndoo and Irwin, together, then went to respondent and secured the telegram correcting the date; Bishop then sent in the order to his company; and the goods were shipped direct to McIndoo.

The first expression to be found anywhere in the transaction, indicating anything to the effect of a primary obligation on the part of the respondent, appears in the letter dated November 24, 1925, sent to respondent by appellant, with a trade acceptance addressed to respondent, as drawee. The respondent replied with a request that the matter be handled in the manner other transactions of that sort for other growers had been handled, suggesting that appellant send a trade acceptance designating McIndoo as acceptor, with the respondent as indorser of such acceptance. The

appellant replied that in conformity with this request, they were sending trade acceptance made out to McIndoo, and they ask respondent to have this accepted by him, with its indorsement, inclosing a trade acceptance addressed to Mc-Indoo, as payee. This not only indicates that the intention of respondent was to sign as indorser, which as we have pointed out, is the idea of suretyship indicated throughout the transaction, but shows that the appellant either concurred in or accepted such intention. If it could be held that the original promise of respondent was a definite one to accept this bill of exchange, these subsequent letters show a changed agreement, and show that then, if not before, the minds of the parties met in an agreement that the respondent should indorse a trade acceptance. However, we think this final arrangement explains the promise and intention originally made and had by the respondent, which the evidence shows to have been at all times concurred in by appellant's agent, Bishop, and finally, if not originally, concurred in by the respondent directly. We conclude that such an unconditional promise as is contemplated by section 3216 of the Civil Code does not here appear, both because the language used is not sufficient to show a definite promise to accept a bill of exchange, and because the surrounding circumstances and the interpretation placed upon the agreement by the parties themselves, show that a conditional signing or a form of suretyship was intended, it being intended that the bill of exchange should be signed by respondent as indorser, after the same had been accepted by McIndoo. This is borne out by the fact that the other part of the deal, that with the Phillips Heater Company, was put through on that basis; there being every indication that both deals were alike and that the same intentions prevailed and the same promises were made in both sales.

The appellant further contends that the respondent is liable under the provisions of section 3218 of the Civil Code, because the trade acceptance was not, within twenty-four hours, returned to the appellant by the respondent, either accepted or nonaccepted; and that the respondent must therefore be deemed to have accepted the same. That section has no application to the respondent as to the last trade acceptance, because the respondent was not named as drawee therein. Neither does it bind the respondent upon

the first trade acceptance sent by appellant, because of the subsequent action of the parties in agreeing upon a different procedure.

For the reasons given the judgment is affirmed.

Marks, J., and Jennings, J., concurred.